### In re TENNESSEE CHEMICAL COMPANY, Debtor.

### Scott N. BROWN, Jr., Trustee in Bankruptcy, Plaintiff,

### v.

### SHELL CANADA, LTD., Defendant.

### Bankruptcy No. 1–89–01106. Adv. No. 90–1087.

United States Bankruptcy Court, E.D. Tennessee.

Oct. 5, 1993.

---

David B. Kesler & Scott N. Brown, Jr., Brown, Dobson, Burnette & Kesler, Chattanooga, TN, for plaintiff.

Richard B. Gossett & Mark D. Hackett, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Chattanooga, TN, for defendant.

### *MEMORANDUM*

RALPH H. KELLEY, Chief Judge.

The plaintiff is the bankruptcy trustee in the case of Tennessee Chemical Company. Before its bankruptcy, Tennessee Chemical paid Shell Canada for supplies and services. The trustee alleges that the payments were preferential transfers under Bankruptcy Code § 547(b). 11 U.S.C.A. § 547(b) (West 1993).

Shell Canada argues that the payments are protected by two of the preference exceptions found in § 547(c)—the exception for transfers in the ordinary course of business and the new value exception. 11 U.S.C.A. § 547(c)(2) & (c)(4) (West 1993). This memorandum is the court's findings of

fact and conclusions of law. FED.R.BANKR. PROC. 7052.

Tennessee Chemical began buying molten sulfur from Shell Canada in 1986. In 1987 Shell Canada and Tennessee Chemical signed a contract for sulfur sales and purchases. The contract provided for delivery to Tennessee Chemical at Shell Canada's place of business by loading the sulfur in tank cars provided by Tennessee Chemical. The risk of loss passed to Tennessee Chemical at that time.

The sulfur contract required Tennessee Chemical to pay for sulfur within 30 days after the date of the invoice. The contract allowed Shell Canada to charge interest on overdue amounts.

Kathleen Downey was Shell Canada's administrator of sulfur contracts. She testified that Shell Canada did not make an invoice for each shipment or for all shipments in one day. It normally issued two invoices for each month—the first invoice for all shipments from the first to the fifteenth and the second invoice for all shipments from the sixteenth through the end of the month. The invoice for the second half of a month was received by Tennessee Chemical the next month.

However, in the three months before Tennessee Chemical's bankruptcy Shell Canada billed more frequently. It had been sending two or three invoices per month, but it began creating more invoices. An invoice might cover only two or three days of sulfur shipments. Ms. Downey said that Tennessee Chemical requested the quicker billing so that it would have a better idea of its financial position.

The molten sulfur was shipped from western Canada to Chicago, Illinois on the Canadian Pacific and the Soo Line railroads. Shell Canada had a contract with Canadian Pacific that gave it cheap shipping rates in Canada. Tennessee Chemical had a contract with CSX that gave it cheap shipping rates in this country. In January 1988, Tennessee Chemical and Shell Canada entered into a contract that allowed each one to ship goods under the other's railroad contract. Shell Canada didn't have this kind of agreement with any other sulfur customer.

Shell Canada paid Canadian Pacific and billed Tennessee Chemical for shipping that Tennessee Chemical did under Shell Canada's contract. Shell Canada's bills to Tennessee Chemical for shipping charges were debit notes instead of invoices.

For Shell Canada's own sulfur shipments, it figured the freight charges and billed Tennessee Chemical before receiving a bill from Canadian Pacific. Tennessee Chemical could also use Shell Canada's contract for non-Shell freight—products that Tennessee Chemical bought from other suppliers in Canada. For non-Shell freight, Shell Canada had to wait for a bill from Canadian Pacific before it could bill Tennessee Chemical for the freight charges.

Shell Canada subleased railroad tank cars to Tennessee Chemical and applied decals and stencils to tank cars for the benefit of Tennessee Chemical. The bills for these services were also debit notes instead of invoices.

In the spring of 1988 Tennessee Chemical asked if the payment terms for sulfur could be extended to 60 days. Shell Canada agreed to a temporary extension. The payment term would be 60 days for all shipments from late April through November 1988, but it would revert to 30 days for shipments after November 1988. Invoices issued in December 1988 for shipments in November allowed 60 days for payment.

Ed Boonstra was Shell Canada's manager of sulfur marketing and distribution. He testified that 30 days was Shell Canada's standard payment term for sulfur purchases. It was not unusual for Shell Canada to grant extended terms to off-shore customers, but it was unusual for a North American customer such as Tennessee Chemical. It had not been done within the last several years before granting the extension to Tennessee Chemical.

The change from 60 days back to 30 days in December 1988 meant that in January 1989 Tennessee Chemical would owe invoices from two months, instead of one.

The court has already mentioned Kathleen Downey, Shell Canada's administrator of sulfur contracts. She testified that Tennessee Chemical was Shell Canada's top sulfur customer in 1988 and was one of the top customers in 1987.

Ms. Downey testified that Tennessee Chemical regularly paid its bills a few days after the due date. She used the date Shell Canada received Tennessee Chemical's check as the date of payment.

On December 19 and 21, 1988 Shell Canada issued two invoices for sulfur shipped in December 1988. These seem to have been the first 30–day invoices issued after the payment terms reverted from 60 days to 30 days. The payment due dates were stated on the invoices as January 19 and 21, 1989 (31 days after the invoice dates).

On January 22 Ms. Downey noticed that Tennessee Chemical had not paid these two invoices. Tennessee Chemical regularly paid a few days late. Ms. Downey would sometimes, but not always, check with Tennessee Chemical to see why the payment was late. She decided to take action when these two invoices were not paid on time. She began watching the account daily, and she notified another Shell Canada employee, Bill Kennedy. Mr. Kennedy was manager of sulfur marketing for North America. He was the person with the most direct contact with Tennessee Chemical.

The evidence was unclear as to whether Tennessee Chemical exceeded its credit limit at this time or at any time. Ms. Downey, Mr. Kennedy, and Mr. Boonstra thought that the credit limit was not a problem or didn't recall it as being a problem. They all said that the problem was Tennessee Chemical's failure to make payments on time. Mr. Boonstra's boss, Cliff Paulson, agreed. Mandy Wahby was the credit manager-resources at the time. Only Ms. Wahby recollected any mention of Tennessee Chemical going over its credit limit. She thought that Ms. Downey had told her, in January 1989, that Tennessee Chemical was over its credit limit as the result of failing to pay some invoices when due.

Mr. Kennedy testified that he did not consider Tennessee Chemical a payment problem until Ms. Downey contacted him in January 1989. Mr. Boonstra also said that he did not consider Tennessee Chemical a payment problem until January 1989.

On February 2, 1989, Mr. Kennedy and Mr. Boonstra were at a meeting in New Orleans, Louisiana. They heard rumors that Tennessee Chemical was having serious financial trouble and might file bankruptcy. Mr. Kennedy checked with his sources in the industry and apparently did not like what he heard. He drafted a hot letter to Tennessee Chemical. Mr. Boonstra approved it. They faxed the letter to Shell Canada's offices in Calgary, Alberta.[1] Mr. Kennedy considered Tennessee Chemical a severe problem at this time and intended the letter to "ruffle up" Tennessee Chemical.

The home office, including Shell Canada's in-house lawyers, re-drafted the letter and toned it down. The letter was sent to Larry J. Lawrence at Tennessee Chemical's office in Atlanta, with copies to W. Pittman and T. Kowalski. Mr. Boonstra's boss, Cliff Paulson, signed the letter; Mr. Paulson was vice-president for natural gas and sulfur marketing. The letter said:

> The extended credit terms ... terminated on November 30, 1988. Since then, payment terms ... have not been observed. Currently the sum of $1,747,-654.45 ... is long overdue and payable by TCC. This represents the total of four invoices and a debit note which were due and payable between January 1 and 30, 1989.
>
> ... Shell requires assurance that TCC has the financial capability to pay its invoices to Shell under the Contract in accordance with its terms.. It is certainly in both Shell and TCC's interest to find a way to continue what has been an excellent business relationship. It is Shell's expectation that such assurances will include a frank and realistic discussion of TCC's plans for Copperhill and the general financial integrity of TCC. In this

---

**1.** For convenience the court will use "fax" to refer to facsimile transmission or telefax.

respect we would appreciate it if you could arrange for discussion between our representatives and your financial representatives.

If payment of the amount, or assurances satisfactory to Shell regarding this payment as well as future payment ... are not received immediately then, ... we will have no alternative than to resort to whatever actions we deem necessary to collect the overdue amount.

Shell Canada sent the letter on February 2, the same day that it received the draft from Mr. Kennedy. Ms. Downey testified that when Shell Canada sent letters by fax, it was noted at the top of the letter. This letter does not contain such a notation or a fax machine's imprint showing when it was transmitted.

On Monday, February 6 Shell Canada sent Tennessee Chemical another letter demanding payment. This letter shows that it was faxed on February 6. Ms. Downey signed the letter on behalf of Mr. Kennedy. The letter was addressed to Wayne Pittman at Tennessee Chemical's office in Atlanta.

Thank you for returning our telephone call this afternoon. Below is a summary of the outstanding invoices which we need to have brought up to date.

[summary discussed below]

Also we have attached for your records a copy of our May 11th FAX outlining the terms of our credit extension.

Although we see a high potential in continuing the mutually beneficial relationship with Tennessee Chemical, your continued payment problems have us very concerned. I would expect that if we do not have our invoices paid up to date, and concrete assurances acceptable to Shell of the continued financial and operational viability of your company, by the end of this week, Shell would have to act to protect its interests.

The letter's summary of overdue debts said that Tennessee Chemical owed about $3.9 million at the close of the day on February 6, 1989. Over $2.1 million of this had come due on February 4 and 5. Another $14,000.00 came due on February 6. The overdue amount included the two 30–day invoices dated December 19 and 21.

On February 7 Shell Canada received a check from Tennessee Chemical for $1,768,-020.70. The check was dated February 3 and was sent by regular first class mail. This is the first of the six payments that the trustee seeks to recover.

On February 8 Shell Canada faxed another letter to Tennessee Chemical demanding payment. This letter was signed by Mr. Paulson and addressed to Bruce Davis, the president of Tennessee Chemical.

Notwithstanding the letter from Shell Canada Limited ("Shell") dated February 2, 1989 to your Mr. L. Lawrence and subsequent conversations between Mr. Wayne Pittman and the undersigned, Shell has received only one payment to reduce the large outstanding and overdue account of Tennessee Chemical Company (TCC).

As of Wednesday, February 8, 1989 the overdue and outstanding balance of TCC has increased to $2,130,455.49. A review of our records indicates that the following invoices remain fully unpaid and overdue as at February 8, 1989:

[list discussed below]

Pursuant to clause 9 of the [sulfur] contract, TCC is required to pay invoiced amounts within thirty (30) days, with interest at the prime lending rate of the Bank of Montreal at Calgary, Alberta plus 2% per annum thereafter. At the date of this letter, the balance outstanding (with interest at 14.25% per annum) is $2,136,497.40.

Demand is hereby made upon you to pay the sum of $2,136,497.40 on or before February 10, 1989. In the event that payment is not received at this office by this date, Shell will have no alternative but to require that all deliveries of sulfur ... from and after February 10, 1989 shall be on a Letter of Credit or equivalent cash basis until all payments overdue and outstanding are made. In addition, Shell will take whatever steps it

deems necessary to effect collection of this amount.

The overdue amount still included the two 30–day invoices dated December 19 and 21. Payment of these invoices was more than two weeks overdue. They totalled about $500,000. The bulk of the overdue debt, about $1.6 million, consisted of three invoices and a debit note that came due on February 4 and 5, three or four days before the letter.

Shell Canada's letters provoked Tennessee Chemical's president, Bruce Davis, to ask for a meeting at Shell Canada's offices in Calgary. The meeting was held on February 13, 1989. According to Mr. Boonstra, Shell Canada wanted to know what Tennessee Chemical was going to do in response to the demand letters.

The minutes of the meeting and the testimony reveal that Shell Canada wanted assurance that it would be paid. Mr. Davis proposed that Tennessee Chemical give Shell Canada a security interest in Tennessee Chemical's assets. Shell Canada's employees held a meeting and decided that obtaining security for the debt was paramount. Shell Canada agreed to take a security interest.

Mr. Kennedy and Mr. Boonstra testified that Tennessee Chemical was the only sulfur customer that gave Shell Canada a security interest in its assets to secure its debts. Mr. Kennedy called this an unusual step for his department. Ms. Downey testified that she didn't know of any other sulfur customer that had given Shell Canada a security interest.

Tennessee Chemical and Shell Canada agreed to re-structure the old debt. Some of the old debts would be put into a long-term promissory note. The time for payment on some of the old debts would be extended to 40 days. Tennessee Chemical would have 40 days, instead of 30 days, to pay future sulfur invoices. Tennessee Chemical agreed to make future payments by wire transfer between banks.

At the February 13 meeting, Mr. Davis mentioned possible problems if Tennessee Chemical filed bankruptcy within 90 days after giving Shell Canada the security interest. Ms. Downey was assigned to contact a lawyer in Washington, D.C., who specialized in bankruptcy. First she asked the lawyer what Mr. Davis meant when he said that Tennessee Chemical was working on an ESOP (an employee stock ownership plan). She also retained him to work on the security agreement.

The court has already mentioned Ms. Wahby. She was Shell Canada's credit manager-resources. She didn't become involved with the Tennessee Chemical problem until the meeting on February 13. Ms. Wahby was assigned to check on Tennessee Chemical's finances after the meeting. In notes to herself, dated February 16, she pointed out that the lawyers contacted by Ms. Downey didn't see a problem with the plan except defending the security interest against a preferential transfer attack. She testified that Shell Canada's discussions of preference law focused on the security interest and not the payments.

The amendment to the sulfur contract was executed March 9. It provided that Tennessee Chemical would have 40 days to pay, but Shell Canada could give notice and change the payment term. The amendment to the rail contract was executed the same day. It provided that Tennessee Chemical would have 22 days after the railway invoice date to pay freight charges.

The security agreement was signed on March 10, 1989, and the financing statement was filed on March 13, 1989. Exhibit C to the security agreement listed a number of invoices and debit notes; some were due after March 10, and others that were due on or before March 10. The invoices and debit notes due on or before March 10 were included in the long-term note and were paid by execution of the note. The invoices and debit notes due after March 10 were to be paid when due. All invoices rendered after March 10 were to be paid when due. The security interest secured all three classes of debts.

The meeting in Calgary was on February 13. Tennessee Chemical made its next payment by check dated February 17, 1989.

Shell Canada received the check on February 23, and Tennessee Chemical's bank paid it on March 2. This check finally paid the two 30–day invoices from December that were due on January 19 and 21. The payment totalled $516,328.16. This is the second payment that the trustee seeks to recover.

The trustee seeks to recover four later payments that Tennessee Chemical made by wire transfer. Ms. Downey testified in effect that these were the only payments Tennessee Chemical made by wire transfer.

The third payment totalled $632,604.91. Tennessee Chemical paid for and sent the wire transfer on March 10, and Shell Canada received it on March 11 or 13. The payment applied to an invoice that was dated February 1 and totalled about $258,000. The time for payment had been extended from 30 to 40 days, which made it due on March 13. (Plaintiff's Exhibits 10, 13, 14 & Ms. Downey's testimony). Thus, the payment was on time or slightly early.

The remainder of the payment applied to a debit note for about $375,000. The debit note was dated February 9 and stated that it was due in seven days. This appears to have been a mistake. Ms. Downey didn't know why it allowed only seven days. The parties agree that, as a result of the February 13 meeting in Calgary, the time for payment was extended. They do not agree on the length of the extension. The trustee says that Tennessee Chemical was given 22 days to pay, but Shell Canada says 40 days. If payment was due in 22 days, the payment was about a week late. If it was due in 40 days, the payment was early.

The fourth payment totalled $391,603.56. Tennessee Chemical paid for and sent the wire transfer on March 17, and Shell Canada received it on March 20. The payment covered two debit notes dated February 20. The debit notes allowed 30 days to pay. The trustee argues that these debit notes were due in 22 days instead of 30. (Plaintiff's exhibits 10, 13 & 14). If they were due in 22 days, they were paid late. If they were due in 30 days, they were paid on time or a little early, depending on when the wire transfer should be treated as payment.

The fifth payment totalled $296,717.50 and covered one invoice dated February 6. Tennessee Chemical paid for and sent the wire transfer on March 23, and Shell Canada received it on March 27. The time for payment had apparently been extended to 40 days, which made the payment due on March 18. (Plaintiff's Exhibits 10 & 15). The payment was late either way.

The sixth payment totalled $150,000. Tennessee Chemical paid for and sent the wire transfer on April 6, and Shell Canada received it on April 7. Tennessee Chemical usually noted what invoices or debit notes were being paid, but it did not do so with this payment. Tennessee Chemical filed its bankruptcy case on April 10.

## THE ORDINARY COURSE OF BUSINESS

The court does not see how the second through the sixth payments could possibly be in the ordinary course of business. Before Tennessee Chemical made the second payment, Shell Canada had poured on the pressure to make sure that Tennessee Chemical paid its bills faster than it had been paying them in the past. The three threatening letters leave no doubt about this.

Shell Canada sent the first and mildest letter on February 2. On February 6 Shell Canada faxed the second letter to Tennessee Chemical. It demanded payment of bills totalling about $3.9 million dollars. More than half of this amount (about $2.1 million) had just become due within two days before the letter was sent. Shell Canada threatened to take whatever actions were necessary to collect if Tennessee Chemical didn't pay up and provide assurances of its continued ability to pay by the end of the week.

On February 7 Shell Canada received a check from Tennessee Chemical for almost $1.8 million. On February 8 Shell Canada faxed its most demanding letter to Tennessee Chemical. The letter acknowledged the payment but demanded that Tennessee

Chemical pay all other bills that were due. The total was about $2.1 million; $1.6 million of this had become due within three or four days before the letter, on February 4 and 5. This letter threatened to require a letter of credit or cash payment for future sales if Tennessee Chemical didn't pay up immediately. This letter was sent to Tennessee Chemical's president, Bruce Davis.

The pressure worked. Mr. Davis called Shell Canada and asked for a meeting at Shell Canada's offices in Calgary. At the meeting on February 13, Shell Canada and Tennessee Chemical worked out a deal that allowed Tennessee Chemical to continue buying on credit. The conditions were unusual. Shell Canada took a security interest in Tennessee Chemical's assets. It consolidated part of the old debt into a long-term note. It extended the payment terms on some of the old debts, and it allowed Tennessee Chemical 40 days to pay new debts for sulfur. Tennessee Chemical agreed to make future payments by wire transfer.

The second payment was made by check dated February 17, after all this had occurred. The payment was made in the usual way, by check, instead of wire transfer. This payment finally paid the two 30-day invoices dated December 19 and 21. The payment was about a month overdue, but Tennessee Chemical may have honestly thought these invoices were due in 60 days instead of 30 days. Even if Tennessee Chemical made an honest mistake as to the due dates, it makes no difference to the outcome. The second payment simply was not in the ordinary course of business.[2]

Whoever was in charge of paying Tennessee Chemical's bills could not possibly have ignored Shell Canada's pressure for payment. The trustee does not need a witness from Tennessee Chemical to say that it made the second through the sixth payments because of Shell Canada's pressure to pay. The exception does not apply because the payments were made after Shell Canada's pressure to pay had taken effect. Shell Canada had already created the danger that Tennessee Chemical would prefer it over other creditors.

Other facts also support the conclusion that the payments were not in the ordinary course. Tennessee Chemical began making payments by wire transfers instead of check. The obvious reasons for paying by wire transfer are to make the payment quicker and to avoid the risk that the debtor's checking account will be emptied or seized before a check can clear. Shell Canada was billing much more rapidly than it had in the past. Shell Canada was already concerned with the effect of a bankruptcy filing by Tennessee Chemical and had contacted a lawyer with experience in bankruptcy cases. The last payment appears to have been a deliberate attempt by Tennessee Chemical to prefer Shell Canada over other creditors. It was an even amount ($150,000), and Tennessee Chemical did not follow its usual practice of designating which bills the payment applied to.

Shell Canada's pressure to pay made payments two through six not in the ordinary course of business. The cases supporting this conclusion are numerous. *See, e.g., Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 14 Bankr.Ct. Dec. 553 (11th Cir.1983); *J.P. Fyfe Co. v. Bradco Supply Corp.*, 96 B.R. 474 (D.N.J. 1988), *aff'd* 891 F.2d 66 (3d Cir.1989); *Clark v. A.B. Hirchfeld Press, Inc. (In re Buyer's Club Markets, Inc.)*, 123 B.R. 895 (Bankr.D.Colo.1991); *Production Steel, Inc. v. Sumitomo Corp. (In re Production Steel, Inc.)*, 54 B.R. 417, 14 Collier Bankr. Cas.2d 185, 42 UCC Rep.Serv. 1285 (Bankr. M.D.Tenn.1985).

This leaves the issue of whether the first payment was made in the ordinary course. The first question is whether Tennessee Chemical wrote the first check before Shell Canada began pressuring it for payment. In particular, did Tennessee Chemical write the check before or after it received the first threatening letter?

Shell Canada sent the first threatening letter on February 2. The letter said that

---

**2.** Ms. Downey's hearsay testimony that someone at Tennessee Chemical asserted this mistake can be admitted or excluded; it makes no difference to the outcome.

Tennessee Chemical owed four invoices and a debit note that had come due in January. These included the two 30–day invoices from December; they were already about two weeks overdue. Tennessee Chemical's check was dated February 3. It paid the other three bills mentioned in the letter but not the two 30–day invoices from December. Instead of paying those, it paid a 60–day invoice and a 60–day debit note that were not due until February 5 and 6. As a result, Tennessee Chemical's check was about $21,000 more than Shell demanded in the February 2 letter ($1,768,026.80 instead of $1,747,654.45).

The court cannot believe that Tennessee Chemical would have deliberately paid different bills if it had already received Shell Canada's letter. Tennessee Chemical needed to keep itself in Shell Canada's good graces. Letting the two 30–day invoices from December get even more overdue was not the way to do that. Furthermore, if Tennessee Chemical had paid the bills mentioned in Shell Canada's letter, it could have saved $21,000 for other uses or for future payments to Shell Canada.

The court concludes that Tennessee Chemical wrote the February 3 check before it received Shell Canada's letter dated February 2. The court cannot say that Shell Canada's pressure to pay made the first payment outside the ordinary course of business.

However, the first payment may be outside the ordinary course for other reasons. The payment applied to five bills. Each bill was incurred when Tennessee Chemical had 60 days to pay, instead of the normal 30 days. Shell Canada's agreement to allow 60 days was unusual. This gives the trustee at least two arguments. First, any bills incurred under the 60–day terms were not incurred in the ordinary course of business. Second, payments under the 60–day terms were not made in the ordinary course of business.

The change to 60 days was made about a year before Tennessee Chemical's bankruptcy. Tennessee Chemical was one of Shell Canada's top sulfur customers and the only sulfur customer that Shell Canada

had a transportation agreement with. Shell Canada agreed to the 60–day term to help Tennessee Chemical through a cash flow shortage.

■ A rare transaction can be in the ordinary course of business. *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 20 Bankr.Ct.Dec. 1319 (6th Cir.1990). This unusual change in payment terms occurred long before bankruptcy in an established business relationship that the parties obviously expected to continue for a long time. The court concludes that the change to 60 days did not make Tennessee Chemical's purchases outside the ordinary course of business for either party. *Cf. In re Magic Circle Energy Corp.*, 64 B.R. 269, 14 Bankr.Ct.Dec. 969, 15 Collier Bankr.Cas.2d 658 (Bankr.W.D.Okla.1986).

It follows that the change to 60 days also did not make the payments outside the ordinary course of business.

The next question is whether the first payment was made according to ordinary business terms. 11 U.S.C.A. § 547(c)(2)(C) (West 1993). The court of appeals has held that "ordinary business terms" means "ordinary business terms in the industry." *Logan v. Basic Dist. Corp. (In re Fred Hawes Organization, Inc.)*, 957 F.2d 239, 22 Bankr.Ct.Dec. 1056 (6th Cir.1992).

Ms. Wahby testified that sulfur sellers use various terms, such as 30, 60, or 90 days from the date of the invoice, and 120 days is common. In the *Fred Hawes* case, the court discounted testimony by the creditor's president, but he testified to a system of billing and due dates that was not believable. *Logan v. Basic Dist. Corp. (In re Fred Hawes Organization, Inc.)*, 957 F.2d 239, 246, 22 Bankr.Ct.Dec. 1056 (6th Cir. 1992). Ms. Wahby's testimony was believable. The court need not discount her testimony solely because she works for Shell Canada. The court concludes that the payment was made according to ordinary business terms.

■ The final question under this exception is whether the first payment was too late to be in the ordinary course of busi-

ness. A late payment can be in the ordinary course of business if late payments were ordinary between the debtor and the creditor, and the payment was not abnormally late. *Yurika Foods v. United Parcel Service (In re Yurika Foods)*, 888 F.2d 42, 19 Bankr.Ct.Dec. 1644, 21 Collier Bankr.Cas.2d 1232 (6th Cir.1989); *Newton v. Andrews Distributing Co. (In re White)*, 64 B.R. 843 (Bankr.E.D.Tenn.1986).

■ This raises the question of whether the court should measure lateness according to when Shell Canada received checks or when the checks were paid by Tennessee Chemical's bank. 11 U.S.C.A. § 547(c)(2) (West 1993).

A similar question comes up under the definition of a preferential transfer. A transfer can be a preference only if it occurred within the preference period, which is usually the 90 days before the date of bankruptcy. 11 U.S.C.A. § 547(b)(4) (West 1993). The courts have faced the question of whether the transfer occurred in the preference period when the creditor received the check before the 90 days but the debtor's bank paid the check within the 90 days.

The courts generally used the date of payment to decide whether the transfer was in the preference period. But under the ordinary course exception, most courts used the date of receipt as the date of the payment, unless the check was post-dated or the debtor's bank did not pay it when it was first presented for payment. 1 DAVID G. EPSTEIN, ET AL., Bankruptcy § 6–16 & § 6–31 at 616 (1992).

In the *Barnhill* case, the Supreme Court agreed with the general rule for deciding whether a transfer occurred in the preference period. The courts must use the date the check was paid. *Barnhill v. Johnson*, — U.S. —, 112 S.Ct. 1386, 118 L.Ed.2d 39, 22 Bankr.Ct.Dec. 1218, 26 Collier Bankr.Cas.2d 323 (1992).

In a footnote the Supreme Court said that it was not deciding which date should be used under the ordinary course exception. The Supreme Court pointed out that the exact date of transfer is less important since the exception no longer requires the debtor's payment to be within 45 days after the debt was incurred. As a result, a court needs to decide only the more general question of whether the transfer was made in the ordinary course of business. — U.S. —, note 9 at —–—, 112 S.Ct. 1386, note 9 at 1391–92.

The trustee relies on *Barnhill* for the argument that the date of payment should be used as the date of transfer under § 547(c)(2). The Supreme Court's footnote suggests something else. When there was nothing out of the ordinary in the way the debtor and the creditor handled the check, then the ordinary delay between receipt and payment of the check should not be relevant to determining the ordinary course of business. The courts can use either date or both dates. The result should be the same.

Of course, the courts may prefer to use the date of receipt for the same reason that they have used it in the past. The facts do not reveal any reason why the court should not use the date of receipt as the date of payment. Therefore, the court will use the date of receipt, February 7.

The check applied to five bills. The parties do not agree on when one of the bills was due. It was a debit note for freight and was dated November 22, 1988. It gave a due date of January 22, 1989 (61 days after its date). The trustee argues that payment was actually due in 22 days. If so, payment was due on December 14, and the payment was 55 days late.

The trustee relies on Ms. Downey's deposition that was taken in August 1990. However, the testimony clearly related to freight debit notes for December 1988 and later.

Question: So, invoices that were generated after November 30, '88 were 30–day invoices?

Answer: Yes, providing they were for December shipment. There may have been invoices for November product, not invoiced until early December, which still would have gone out at the 60–day [term] because they were for November

product. For December product and freight 60 days or, I'm sorry, 30 days; 22 or 15 for freight.

Ms. Downey prepared Exhibit A shortly after Tennessee Chemical filed bankruptcy. In Exhibit A she used 60–day terms for all debit notes dated from June 1 through December 6, 1988. The exhibits include only two debit notes with 60–day terms. One is the debit note in question. The other is the last debit note shown on Exhibit A as having been due in 60 days. It is dated December 6, 1988 and is for subleasing in September 1988. (Defendant's exhibit 9)

The trustee's evidence does not show that the written debit note stated the wrong payment terms. The court will treat the debit note as due when it said it was due, on January 22. Counting the date the check was received, the payment was sixteen days late.

■ If the court looks at Tennessee Chemical's payment record from 1986 onward, sixteen days was not unusually late. Tennessee Chemical went through a time in late 1987 and early 1988 when its payments were regularly more than 20 days late. Then, in April 1988, Shell Canada agreed to give Tennessee Chemical 60 days to pay instead of 30. Under this arrangement, Tennessee Chemical's payments were usually less than ten days late. Defendant's Exhibit A shows about 45 payments under the sixty days terms. Only two other payments, both in November 1988, were more than ten days late.

Tennessee Chemical's payment record under the 60–day terms should be used to determine the ordinary course. Shell Canada took the unusual step of giving Tennessee Chemical 60 days so that it could pay on time despite a cash flow shortage, and payments under the 60–day terms were closer to the due dates. Tennessee Chemical's older and worse payment record should not be used to determine lateness with regard to these bills, which were all due in 60 days. This means that the payment sixteen days late was abnormally late.

Furthermore, the court cannot ignore what happened when Tennessee Chemical failed to pay the two 30–day invoices from December that were due at almost the same time. They were due on January 19 and 21. When Tennessee Chemical failed to pay them on the due dates, Ms. Downey raised an alarm almost immediately. The alarm turned to pressure when Mr. Kennedy and Mr. Boonstra heard the rumors that Tennessee Chemical was about to fail. On February 2 they began the series of threatening letters that led to the unusual changes in how Tennessee Chemical did business with Shell Canada. In early February, Shell Canada was not treating sixteen days as a normal or acceptable delay in payment.

The court concludes that the payment sixteen days late was too late to be in the ordinary course of business. The same conclusion applies to another bill paid by the first check. The other bill was a sulfur invoice due on January 21. The payment was seventeen days late.

In summary, the court concludes that the first payment was abnormally late and outside the ordinary course of business as to the invoice and the debit note due on January 21 and 22. These totalled $894,519.88 ($243,945.52 + $650,574.36).

The first check paid three other bills that were due on January 30, February 5, and February 6. Including the date the check was received, these three bills were paid one, two, and eight days late. This was consistent with the timing of Tennessee Chemical's earlier payments on bills that were due in 60 days. The payment of these three bills was not too late to be in the ordinary course of business.

In summary, the court finds Shell Canada's pressure for payment made the second through the sixth payments not in the ordinary course of business. The first payment was in the ordinary course of business except for the invoice and the debit note that were paid sixteen and seventeen days late.

## THE NEW VALUE EXCEPTION

■ The new value exception allows a creditor to offset a preferential transfer by the amount of new value the creditor furnished to or for the benefit of the debtor. 11 U.S.C.A. § 547(c)(4) (West 1993). The exception allows the offset only for new value transferred after the preferential transfer.

■ The court begins with the question of when Shell Canada gave new value to Tennessee Chemical.

Shell Canada completed the delivery of sulfur and Tennessee Chemical became liable for the price at the time of shipment, when Shell Canada loaded the sulfur on rail cars for delivery to Tennessee Chemical. The trustee and Shell Canada agree that new value was given when the sulfur was shipped. *Energy Cooperative, Inc. v. Fina Oil & Chemical Co. (In re Energy Cooperative, Inc.)*, 103 B.R. 171 (N.D.Ill. 1986). *Production Steel, Inc. v. Sumitomo Corp. (In re Production Steel, Inc.)*, 54 B.R. 417, 14 Collier Bankr.Cas.2d 185, 42 UCC Rep.Serv. 1285 (Bankr.M.D.Tenn. 1985).

Shell Canada provided goods and services directly to Tennessee Chemical by putting stencils and decals on rail cars. New value was given when the work was done. *Excel Enterprises, Inc. v. Sikes, Gardes & Co. (In re Excel Enterprises, Inc.)*, 83 B.R. 427 (Bankr.W.D.La.1988).

Shell Canada subleased tank cars to Tennessee Chemical. Tennessee Chemical received new value while the tank cars were subleased, not when Shell Canada sent the bill. *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 45 B.R. 112, 11 Collier Bankr.Cas.2d 1378 (Bankr.M.D.Tenn.1984), *aff'd* 78 B.R. 146 (M.D.Tenn.1987), *rev'd on other grounds*, 872 F.2d 739, 19 Bankr.Ct. Dec. 372 (6th Cir.1989); *Remes v. Yeomans (In re Quality Plastics, Inc.)*, 41 B.R. 241, 11 Collier Bankr.Cas.2d 163 (Bankr. W.D.Mich.1984).

■ The answer is not so easy with regard to the freight charges. Shell Canada argues that the situation is the same as if it paid Tennessee Chemical's debt. Suppose that Tennessee Chemical had been buying supplies from XYZ Corporation but fell behind in payments. Shell Canada, being interested in keeping Tennessee Chemical in business, paid the debt to XYZ. Shell Canada would have given new value at the time it paid the debt. The effect would have been the same as a loan from Shell Canada to Tennessee Chemical.

Other three-party transactions are more difficult to analyze. *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 56 B.R. 339, 13 Bankr.Ct.Dec. 1172 (Bankr.D.Minn. 1985), *aff'd in part & remanded*, 850 F.2d 1275, 20 Collier Bankr.Cas.2d 19, 7 UCC Rep.Serv.2d 656 (8th Cir.1988), *on remand*, 96 B.R. 913 (Bankr.D.Minn.1989).

In the *Bellanca Aircraft* case, Bellanca had fallen behind in payments to a supplier, Lycoming. Another creditor, AGCO, started buying engines from Lycoming and having them delivered directly to Bellanca. Since the transaction amounted to a sale by AGCO to Bellanca, the bankruptcy court correctly decided that Bellanca received new value from AGCO when the engines were delivered, not when AGCO paid Lycoming.

Suppose that the transaction had occurred in a slightly different way. Lycoming would sell to AGCO on credit. AGCO agreed to let Bellanca charge purchases to AGCO's account with Lycoming. AGCO would pay Lycoming, and Bellanca would pay AGCO. The effect would be the same as before. Bellanca would have received new value when it received the engines. It would not have received any more new value when AGCO paid for the engines.[3]

This is essentially what happened between Shell Canada and Tennessee Chemical. Shell Canada agreed to pay Canadian Pacific for shipping that Tennessee Chemical charged to Shell Canada's account. Shell Canada didn't just step in after the

**3.** The court of appeals in the *Bellanca* case seems to have reached the opposite result with regard to AGCO's payments to the Eagle suppliers, but the situation may be distinguishable.

fact and pay a debt from Tennessee Chemical to Canadian Pacific. When the shipping was done, Shell Canada incurred a debt to Canadian Pacific, and Tennessee Chemical incurred a debt to Shell Canada. This is most obvious with regard to Shell Canada freight. Shell Canada billed Tennessee Chemical for the freight charges before it ever received a bill from Canadian Pacific. Tennessee Chemical received new value when the shipping was done, not when Shell Canada paid the bill.

The court will use the dates the shipping began as shown by the exhibits. The court assumes that some shipping began before the first preferential payment but ended afterward. Shell Canada will not get new value credit for the part that occurred afterward. The evidence does not allow the court to calculate the cost of this shipping or to say that legally it should be treated as subsequent new value.

■ With regard to when the new value was given, the final problem pertains to the freight penalty. Shell Canada's contract with Canadian Pacific required it to ship a minimum volume each year or pay a penalty of so many dollars per ton. The rail contract between Shell Canada and Tennessee Chemical provided that they would divide the minimum into shares. Ms. Downey testified that Shell Canada shipped more than its share for the year ending March 31, 1989, but Tennessee Chemical did not ship its share. As a result, Shell Canada charged the whole penalty to Tennessee Chemical.

The trustee argues that the penalty should be treated as a charge that accrued daily during the course of the year. Shell Canada argues that it gave all the new value when it paid the penalty. The court agrees with Shell Canada on this point. The penalty was an annual settling-up charge. Shell Canada's debt for the penalty arose at the end of the contract year, and likewise, Tennessee Chemical's obligation to reimburse Shell Canada arose when Shell Canada paid the penalty.

In summary Shell Canada may be entitled to new value credit for (1) sulfur that was shipped after a preferential transfer,

(2) freight charges incurred after a preferential transfer, (3) charges for applying stencils and decals to tank cars after a preferential transfer, (4) rent for subleasing tank cars after a preferential transfer, and (5) the freight penalty.

■ The court cannot decide which new value transfers came after a preferential transfer without deciding when the preferential transfers occurred. This raises for the second time the question of whether the two checks were preferential transfers when Shell Canada received them or when they were paid by Tennessee Chemical's bank. The court used the date of receipt under the ordinary course exception. Should the court use the date of receipt under the new value exception also?

In the *Belknap* case the court of appeals held that the date of receipt should be used to decide whether the transfer occurred during the preference period. *Unsecured Creditors' Committee v. Shaler Corp. (In re Belknap, Inc.)*, 909 F.2d 879, 16 UCC Rep.Serv.2d 408 (6th Cir.1990). The court reasoned that "transfer" should mean the same thing under the preference definition in § 547(b) and the preference exceptions § 547(c).

The Supreme Court's decision in *Barnhill* rejected this reasoning. The definition of transfer means that the transfer occurs when the check is paid. *Barnhill v. Johnson,* —— U.S. —— at —— – ——, 112 S.Ct. 1386 at 1390–91, 118 L.Ed.2d 39 (1992); 11 U.S.C.A. § 101(54) (West 1993) (misnumbered, should be 58). The Supreme Court also relied on the rules in § 547(e) for determining when a transfer occurs, but only after resting its decision mainly on the definition of transfer and state law related to checks. As a result, this court cannot rely on the definition of transfer and the reasoning in *Belknap* to hold that "transfer" in the new value exception means receipt of the check.

*Barnhill* also rejected the relation-back argument under § 547(e). As a general rule, the time of transfer is when the transfer is perfected. However, if the transfer is perfected within ten days after it took

effect between the parties, the time of transfer relates back to when it took effect between the parties. 11 U.S.C.A. § 547(e)(2)(A) (West 1993).

This leads to a simple argument: the transfer takes effect between the parties when the creditor receives the check; the transfer is perfected when the debtor's bank pays the check; if the check is paid within ten days after it was received, the time of transfer relates back to when the check was received. *Compare Global Distribution Network, Inc. v. Star Expansion Co.*, 949 F.2d 910, 16 UCC Rep.Serv.2d 394 (7th Cir.1991) *and Johnson v. Barnhill (In re Antweil)*, 931 F.2d 689, 21 Bankr.Ct. Dec. 1069, 24 Collier Bankr.Cas.2d 1772, 16 UCC Rep.Serv.2d 400 (10th Cir.1991) *aff'd Barnhill v. Johnson*, — U.S. —, 112 S.Ct. 1386, 118 L.Ed.2d 39, 22 Bankr.Ct. Dec. 1218, 26 Collier Bankr.Cas.2d 323 (1992).

The dissent made the argument in *Barnhill*, but the majority disagreed; it held that the transfer does not take effect between the parties until the check is paid. — U.S. at — & —, 112 S.Ct. at 1391 & 1393. Since there is no transfer until the check is paid, the time of transfer cannot relate back to the date of receipt.

The court has already discussed the Supreme Court's footnote that dealt with the ordinary course exception. The cases cited in the footnote dealt with the ordinary course exception or the contemporaneous exchange exception, not the new value exception. *Barnhill v. Johnson*, — U.S. —, 112 S.Ct. 1386, footnote 9 (1992). The new value exception is different. Since it specifically applies to new value given "after the transfer," the court must determine the time of transfer. Under *Barnhill*, the transfer occurred when the check was paid. *See also McClendon v. Cal–Wood Door (In re Wadsworth Building Components, Inc.)*, 711 F.2d 122, 10 Bankr.Ct.Dec. 975, 8 Collier Bankr.Cas.2d 1166 (9th Cir.1983), *explained Kupetz v. Elaine Monroe & Associates, Inc. (In re Wolf & Vine, Inc.)*, 825 F.2d 197, 16 Bankr.Ct.Dec. 736, 17 Collier Bankr.Cas.2d 305 (9th Cir.1987).

For the wire transfers, the court used the dates that Tennessee Chemical paid for and sent the transfers. The following list is the court's calculation of the preference.

| Payments & New Value | | Net Preference |
|---|---|---|
| 2/13 Preferential payment | | 894,519.88 |
| 2/13    sulfur inv. 14775;  2/27;  52,649.67 | 6,631.66 | |
| 2/13    subleasing dn 3/16;  4,645.30 | 113.30 | |
| 2/13    subleasing dn 2/22;  16,326.53 | 22.66 | |
| 2/13    subleasing dn 3/16;  3,523.63 | 90.64 | |
| 2/14    freight dn 2/20;  288,222.22 | 27,545.04 | |
| 2/14–17  sulfur inv. 14775;  2/27;  52,649.67 | 46,018.01 | |
| 2/14–3/1 subleasing dn 3/16;  4,645.30 | 1,620.19 | |
| 2/14–24  subleasing dn 2/22;  16,326.53 | 135.96 | |
| 2/20–24  sulfur inv. 14778;  2/28 | 165,844.58 | |
| 2/14–28  freight dn 3/3;  93,193.32 | 75,599.33 | |
| 2/16–24  freight dn 3/3;  60,021.03 | 60,021.03 | |
| 2/14–3/1 subleasing dn 3/16;  3,523.63 | 1,450.24 | |
| 2/27–28  sulfur inv. 14781;  3/1 | 45,973.24 | |
| 3/1    freight dn 3/8;  25,136.52 | 4,956.45 | |
| 3/1    sulfur inv. 14794;  3/14;  119,172.49 | 6,657.41 | |
| Subtotal of new value | – 442,679.74 | |
| Net preference | | 451,840.14 |
| 3/2 Preferential payment | 516,328.16 | |
| Net preference | | 968,168.30 |
| 3/2    sulfur inv. 14794;  3/14;  119,172.49 | 52,987.63 | |
| 3/2    freight dn 3/15;  35,288.94 | 20,178.15 | |
| 3/2    freight dn 3/15;  30,136.67 | 10,048.27 | |

| | | | |
|---|---|---|---|
| 3/2 | subleasing dn 3/16; 4,645.30 | 67.98 | |
| 3/2 | subleasing dn 3/16; 3,523.63 | 90.64 | |
| 3/3 | sulfur inv. 14794; 3/14; 119,172.49 | 59,527.45 | |
| 3/3 | freight dn 3/15; 35,288.94 | 15,110.79 | |
| 3/7 | freight dn 3/15; 30,136.67 | 20,088.34 | |
| 3/3–9 | subleasing dn 3/16; 4,645.30 | 362.56 | |
| 3/3–9 | subleasing dn 3/16; 3,523.63 | 611.82 | |
| 3/6–9 | sulfur inv. 14795; 3/17; 98,655.99 | 91,878.46 | |
| 3/7–9 | freight dn 3/22 | 27,645.29 | |
| Subtotal of new value | | − 298,597.38 | |
| Net preference | | | 669,570.92 |
| 3/10 Preferential payment | | 632,604.91 | |
| Net preference | | | 1,302,175.83 |
| 3/10 | subleasing dn 3/16; 4,645.30 | 22.66 | |
| 3/10 | sulfur inv. 14795; 3/17; 98,655.99 | 6,777.53 | |
| 3/10 | subleasing dn 3/16; 3,523.63 | 79.31 | |
| 3/11 | subleasing dn 3/16; 3,523.63 | 79.31 | |
| 3/12 | subleasing dn 3/16; 3,523.63 | 79.31 | |
| 3/13 | subleasing dn 3/16; 3,523.63 | 56.65 | |
| 3/14 | subleasing dn 3/16; 3,523.63 | 11.33 | |
| 3/16 | stencils & decals; dn 3/16 | 2,000.00 | |
| Subtotal of new value | | − 9,106.10 | |
| Net preference | | | 1,293,069.73 |
| 3/17 Preferential payment | | 391,603.56 | |
| 3/23 Preferential payment | | 294,717.50 | |
| 4/6 Preferential payment | | 150,000.00 | |
| Net preference | | | 2,129,390.73 |
| 4/7 11/12 of the freight penalty | | − 131,124.58 | |
| TOTAL NET PREFERENCE | | | 1,998,266.21 |

The first preferential transfer totalled about $895,000. Suppose that Shell Canada had made new value transfers of $1,000,000 after the first preferential transfer and before the second. That would have reduced the net preference to zero and left excess new value of about $105,000. As the court understands the law, the excess new value could not be used to offset any preferential transfer. The earlier payment would no longer be a preferential transfer; the exception says that a transfer is not a preferential transfer to the extent it is reduced by subsequent new value. The excess could not be used to offset later preferential transfers because it would not be subsequent to them. *See, e.g., Valley Candle Mfg. Co. v. Stonitsch (In re Isis Foods, Inc.)*, 39 B.R. 645 (W.D.Mo.1984); *Eisenberg v. O. Censor & Co., Inc. (In re Baumgold Bros., Inc.)*, 103 B.R. 436, 19 Bankr.Ct.Dec. 1023 (Bankr. S.D.N.Y.1989); *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 45 B.R. 112, 11 Collier Bankr.Cas.2d 1378 (Bankr. M.D.Tenn.1984), *aff'd* 78 B.R. 146 (M.D.Tenn.1987), *rev'd on other grounds*, 872 F.2d 739, 19 Bankr.Ct.Dec. 372 (6th Cir.1989).

Using one date as the time of a preferential transfer may result in excess undeductible new value, when using a different date would not. In this case the choice of dates does not make a difference. The court could use the date the second check was received or the date it was paid. In combination with either of those dates, the court could use the dates the wire transfers were paid for and sent or the dates they were received. The final total would still be the same. Each new value transfer after the first check was paid would come after one or more preferential transfers, and using the different dates would not create any undeductible excess new value.

■ Of course, the court's decision that the check transfers occurred when the checks were paid does make a difference to the total preference in one way. It prevents Shell Canada from getting new value credit for transfers made on the day the first check was received through the day before it was paid. Those new value transfers were not after a preferential transfer as required by the new value exception.

■ The same reasoning applies with regard to another problem. Shell Canada gave new value on the same days as some of the preferential transfers. Should new value given on the same day as a preferential transfer be treated as given before or after the preferential transfer?

It makes no difference with regard to new value transfers made on the same days as the second through sixth payments. Those new value transfers were after one or more preferential transfers, and treating them as made before the payments on the same days would not create any excess undeductible new value.[4]

However, new value transfers made on the same day as the first payment can be deducted only if they are treated as having been made after the first payment. The court doubts that Shell Canada and Tennessee Chemical could prove the exact hour and minute of the various transfers to and from each other on a particular day. Since the court is judging by complete days, Shell Canada will be treated more fairly, and more in line with the exception's purpose, if the court treats new value transfers made on the same day as the first payment as made after the payment. Therefore, the court has deducted new value given on the day that Tennessee Chemical's bank paid the first check.

The court's new value calculation follows the trustee's calculation closely, but with some differences.

There were three debit notes for subleasing. The court calculated different amounts using the exact dates shown by Shell Canada's exhibits.

With regard to the February 20 debit note for freight, in the amount of $288,-222.22, the court calculated a different amount of shipping done on February 14.

The court rejected the trustee's argument that the freight penalty should be prorated and only sixteen days deducted. However, the court did not allow the entire penalty as new value, for reasons explained below.

■ A transfer of new value can *not* be deducted if the transfer or the resulting debt is secured by an unavoidable security interest. 11 U.S.C.A. § 547(c)(4)(A) & (B) (West 1993). Shell Canada's security interest secured debts incurred after the security interest was perfected. The trustee apparently concedes that Shell Canada's security interest cannot be avoided as a preference with respect to the later debts. 11 U.S.C.A. § 547(b)(2) (West 1993).

The court has followed the trustee's evidence in excluding new value transfers on the ground that Tennessee Chemical's resulting debt to Shell Canada is secured by an unavoidable security interest. Mr. Ralph Reece testified for the trustee as to the later debts that are secured. The court has excluded the secured debts as shown by plaintiff's exhibit 23, which Mr. Reece prepared. This includes one month ($\frac{1}{12}$) of the freight penalty. The security interest secured all invoices and debit notes rendered after March 10, 1989. All of the invoices and debit notes included in Mr. Reece's calculation were rendered after March 10. Neither party explained Mr. Reece's calculation exactly. Mr. Reece apparently began with the amount of Shell Canada's secured claim, as shown by its proof of claim, and then he figured out which subsequent debit notes and invoices were included in the total. This is the only evidence with regard to which debts are

---

**4.** In order to do various calculations, the court split some of the invoices and debit notes down into days or groups of days, as shown by the table.

**518**

validly secured, and the court sees no reason to doubt its accuracy.[5]

With regard to the amount of the preference, the final question is whether Shell Canada should get credit for a new value transfer that Tennessee Chemical subsequently paid for. The fourth payment paid the freight debit note that totalled $288,222.22. The court counted $27,545.04 of this amount as new value.

Some courts have held that a new value transfer can be deducted only if the resulting debt "remains unpaid." *See, e.g., In re Prescott,* 805 F.2d 719 (7th Cir.1986); *Braniff, Inc. v. Sundstrand Data Control, Inc. (In re Braniff, Inc.),* 154 B.R. 773, 24 Bankr.Ct.Dec. 141 (Bankr.M.D.Fla. 1993).

■ The court sees no reason to invent such a rule when the statute expressly deals with the problem. The exception provides that a transfer of new value cannot be deducted if, on account of the transfer, the debtor made an otherwise unavoidable transfer to or for the benefit of the creditor. In other words, the payment by Tennessee Chemical does not, by itself, prevent the new value from being deducted. It depends on whether the payment for the new value is avoidable or unavoidable. 11 U.S.C.A. § 547(c)(4)(B) (West 1993).

The fourth payment is totally avoidable as a preferential transfer. As a result, the new value transfer can still be deducted. The reasoning behind this rule is obvious. The new value was deducted from the earlier preferential transfer, but it was added back to the total as part of the fourth payment, since the payment is avoidable as a preference. The trustee would recover the same amount twice if the court disallowed the deduction and allowed the trustee to recover the payment.

Shell Canada made new value transfers to Tennessee Chemical after the fourth payment, but they do not make a difference. New value transfers should offset the oldest remaining preferences first. This means that the new value transfers after the fourth payment offset preferential payments before the fourth payment. They did not offset the fourth payment and make it unavoidable to any extent.

The result would be the same even if later new value transfers had made the fourth payment totally unavoidable. Suppose that immediately after the fourth payment Shell Canada shipped sulfur to Tennessee Chemical worth exactly the amount of the net preference at that time. This should make the net preference zero. The trustee could argue that he should recover $27,545.04. This amount was deducted as new value, but Tennessee Chemical paid for it, and the payment would be unavoidable. However, allowing the trustee to recover would not make sense. Tennessee Chemical would not have lost the $27,545.04. Shell Canada's transfers of subsequent new value would equal the preferential payments. The net preference should be zero.

■ This reasoning may be justified as an interpretation of "otherwise unavoidable" in § 547(c)(4): new value is not deductible if (1) the debtor later pays for it, and (2) the payment is unavoidable for some reason other than the creditor's transfers of new value after the payment. But the same result should be reached even if it is not clear from the wording of the exception. *Boyd v. The Water Doctor (In re Check Reporting Services, Inc.),* 140 B.R. 425, 22 Bankr.Ct.Dec. 1568 (Bankr. W.D.Mich.1992).

Finally, the court must deal with an evidence question. Shell Canada objected to Mr. Reece's preference calculations. Shell Canada complained of Mr. Reece's legal assumptions as to when the preferential transfers occurred and when Shell Canada gave new value.

If a jury were deciding the facts, the court would be faced with a more difficult question. The question is not so difficult when the judge is determining the facts. The judge is not likely to be misled or confused by underlying legal assumptions.

---

**5.** The parties did not argue whether the amount of the preference must be decreased to the extent the proceeds of the collateral are less than the amount of Shell Canada's secured claim.

---

519

The judge may exclude the evidence if the underlying legal assumptions are so far-fetched that the evidence is not usable. Otherwise, the judge can let the evidence in. If the judge subsequently disagrees with the legal assumptions, he can discount the testimony or exhibit.

Mr. Reece's assumptions were reasonable and were revealed. The situation is basically the same as if the trustee's lawyers told him to use the assumptions he used. His testimony and exhibits cannot be excluded on the ground that they were offered to prove the law or that they are too inaccurate. *Cf. Management Systems Associates, Inc. v. McDonnell Douglas Corp.,* 762 F.2d 1161 (4th Cir.1985); Fed. R.Evid. 403 & 703 (West 1984 & Supp. 1993).

The court will enter judgment for the trustee in the amount of the net preference shown above.