In re **TENNESSEE CHEMICAL COMPANY, Debtor.**

**Scott N. BROWN, Jr., Trustee, Plaintiff–Appellee, Cross–Appellant,**

v.

**SHELL CANADA LIMITED, Defendant–Appellant, Cross–Appellee.**

Nos. 95–6053, 95–6102.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 8, 1996.

Decided April 23, 1997.

Rehearing Denied May 13, 1997.

Rehearing and Suggestion for Rehearing
En Banc Denied May 27, 1997.

Richard B. Gossett, Mark D. Hackett (argued and briefed), Baker, Donelson, Bearman & Caldwell, Chattanooga, TN, for Defendant–Appellant.

David B. Kesler (argued and briefed), Scott N. Brown, Jr., Brown, Dobson, Burnette & Kesler, Chattanooga, TN, for Plaintiff–Appellee.

Before: BOGGS and NORRIS, Circuit Judges; HOOD, District Judge.*

ALAN E. NORRIS, Circuit Judge.

After a series of financial setbacks, Tennessee Chemical Company ("TCC") filed a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code. This action stems from an adversary proceeding initiated by the bankruptcy trustee against Shell Canada, Ltd., seeking to limit the amount of Shell's secured claim and to recover as preferences certain payments made to Shell by TCC.

Three issues are presented on appeal: first, whether the bankruptcy court committed clear error by finding that TCC was insolvent during the preference period; second, whether the bankruptcy court erred in finding that payment made by TCC on two debts owed to Shell fell outside the ordinary course of business exception; and, third, whether a transfer by check occurs on the date of honor or the date of receipt for purposes of the new value exception to the

trustee's preference avoidance power, 11 U.S.C. § 547(c)(4).

### I.

Shell, a Canadian company based in Calgary, produces natural gas. Beginning in 1986, it began selling sulfur, a by-product of natural gas, to TCC for use in the manufacture of sulfuric acid. This relationship was formalized by a long-term contract originally effective January 1, 1987. The following year, the two companies also entered into a cost-sharing arrangement for railway transportation. Under this railway agreement, Shell issued a "debit note" to TCC for freight charges incurred under Shell's existing railway contracts.

In early 1988, TCC informed Shell that it had a significant cash-flow problem that required extended credit terms. Instead of paying invoices and debit notes within thirty days, TCC agreed to pay Shell within sixty days during this period of financial difficulty, which ran from approximately May to November of 1988. Thereafter, the payment window reverted to thirty days.

Two payments that are at issue in this appeal were made during the sixty-day period: TCC paid $243,945.52 on an invoice and $650,574.36 on a debit note. These payments were seventeen and sixteen days late, respectively.

In January 1989, an account administrator for Shell began to look into securing payment for two new invoices that were overdue. After encountering little success through a series of demand letters, Shell agreed to meet with TCC executives in Calgary on February 13. There they negotiated an agreement, formalized on March 10, in which TCC granted Shell a lien on many of its assets. This lien, which was perfected on March 13, served as security for past and future obligations to Shell.

All of this activity culminated on April 10, 1989 when TCC filed its voluntary Chapter 11 petition. Scott N. Brown, Jr., the bankruptcy trustee, instituted an adversarial pro-

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

ceeding against Shell on May 3, 1990, seeking to limit the amount of Shell's secured claim against TCC and to recover as preferences some of the payments that TCC had made to Shell within the ninety-day period before the filing of the petition.

## II.

### 1. Solvency of TCC

By agreement of the parties, the bankruptcy court bifurcated the proceedings below. In the first of two opinions at issue on appeal, the bankruptcy court addressed the question whether TCC was insolvent when it transferred the security interest to Shell in March 1989. *In re Tennessee Chem. Co.*, 143 B.R. 468 (Bankr.E.D.Tenn.1992). The bankruptcy trustee argued that, due to the insolvency of TCC at the time of the transfer, the transfer could be avoided under 11 U.S.C. § 547(b). The bankruptcy court agreed and entered an order finding that TCC was insolvent at the time of the disputed transfer to Shell. 143 B.R. at 480. The district court affirmed that decision on appeal.

■■■ On appeal to this court, we independently review decisions of the bankruptcy court. Factual findings are reviewed for clear error, while legal conclusions are subject to de novo review. *In re Chavis*, 47 F.3d 818, 821 (6th Cir.1995). A bankruptcy court's determination that a debtor was insolvent at the time of a transfer for purposes of § 547(b) is a factual finding that is reviewed for clear error. *In re Lamar Haddox Contractor, Inc.*, 40 F.3d 118, 120 (5th Cir.1994).[1]

■■ Having had the benefit of extensive briefing and oral argument, we cannot say that the bankruptcy court committed clear error in finding that TCC was insolvent at the time of the transfer at issue. Accordingly, we affirm the finding of insolvency based upon the reasoning advanced by the bankruptcy court and affirmed by the district court.

### 2. Ordinary Course of Business

We turn next to the bankruptcy court's finding that payment of an invoice and a debit note to Shell fell outside the "ordinary course of business" exception to the trustee's preference avoidance power.[2] As mentioned earlier, the invoice in the amount of $243,-945.52 and the debit note in the amount of $650,574.36 were seventeen and sixteen days late, respectively.

With regard to the debit note, the bankruptcy court offered the following rationale for its finding:

> If the court looks at Tennessee Chemical's payment record from 1986 onward, sixteen days was not unusually late. Tennessee Chemical went through a time in late 1987 and early 1988 when its payments were regularly more than 20 days late. Then, in April 1988, Shell Canada agreed to give Tennessee Chemical 60 days to pay instead of 30. Under this arrangement, Tennessee Chemical's payments were usually less than ten days late. Defendant's Exhibit A shows about 45 payments under the sixty day terms. Only two other payments, both in November 1988, were more than ten days late.
>
> Tennessee Chemical's payment record under the 60–day terms should be used to determine the ordinary course. Shell Canada took the unusual step of giving Tennessee Chemical 60 days so that it could pay on time despite a cash flow shortage, and payments under the 60–day terms were closer to the due dates. Tennessee Chemical's older and worse payment record should not be used to determine lateness with regard to these bills, which were all due in 60 days. This means that the

---

1. We recognize, of course, that where the bankruptcy court's fact finding arises from a misunderstanding of the law, it is reviewed for plain error of the law. *In re Fulghum Const. Corp.*, 872 F.2d 739, 742 (6th Cir.1989) (citing *Morgan v. K.C. Machine & Tool Co.*, 816 F.2d 238, 244 (6th Cir.1987)).

2. Under 11 U.S.C. § 547(c)(2),

> [t]he trustee may not avoid under this section a transfer to the extent that such transfer was (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and transferee; and (C) made according to ordinary business terms.

payment sixteen days late was abnormally late.

Furthermore, the court cannot ignore what happened when Tennessee Chemical failed to pay the two 30–day invoices from December that were due at almost the same time. They were due on January 19 and 21. When Tennessee Chemical failed to pay them on the due dates, Ms. Downey raised an alarm almost immediately. The alarm turned to pressure when Mr. Kennedy and Mr. Boonstra heard the rumors that Tennessee Chemical was about to fail. On February 2 they began the series of threatening letters that led to the unusual changes in how Tennessee Chemical did business with Shell Canada. In early February, Shell Canada was not treating sixteen days as a normal or acceptable delay in payment.

*In re Tennessee Chem. Co.,* 159 B.R. 501, 512 (Bankr.E.D.Tenn.1993). The bankruptcy court applied similar reasoning in determining that the invoice fell outside the ordinary course of business exception. *Id.* The district court affirmed.

██ While the resolution of this issue represents a factual determination reviewable for clear error, *In re Fulghum Const. Corp.,* 872 F.2d 739, 742 (6th Cir.1989), we have repeatedly urged bankruptcy courts to consider several factors in reaching a decision on the ordinary course question. *In re Yurika Foods Corp.,* 888 F.2d 42, 45 (6th Cir.1989). These factors include the history of the parties' dealings with each other, timing, amount at issue, and the circumstances of the transaction. *Id.* Generally, the entire course of dealing is considered. *In re White,* 64 B.R. 843 (Bankr.E.D.Tenn.1986).

██ While the circumstances of this case pose a very close question, we believe that TCC's history of late payments to Shell is so extensive that the two payments in dispute were made in the ordinary course of business. Accordingly, we reverse the bankruptcy court on this issue.

TCC had made 149 payments to Shell in the previous two and one-half years. When it had 30 days to pay, all but a few payments had been late. In fact, they had been late by up to 64 days, meaning that some were paid up to 94 days after the invoice date.

When the terms were lengthened to 60 days, most payments continued to be late. The most delinquent payments, other than the two in question, were 12, 13, 15 and 37 days late, meaning payment was made 72 to 97 days after the invoice date.

In short, TCC was a struggling company that paid when it could. Even though the two payments at issue were among the latest (though not the absolute latest), they were not out of the ordinary course of business between the two parties. TCC had a pattern of paying several invoices with one check, as it did in this case. Of course, this means that the very same check is "late" in varying degrees. Indeed, with respect to the payments at issue, the very same check was deemed to be outside the usual course of business regarding two invoices, for which it was late by 16 and 17 days, but within the ordinary course of business as to three other invoices, for which it was late by 1, 2, and 8 days. In a similar fashion, TCC made a payment on September 24, 1987, which was late by 7, 11, 19, and 20 days as to varying invoices (under 30–day terms); under 60–day terms on November 10, 1988, late by 8 and 37 days; and November 22, 1988, late by 13 and 15 days.

Since the payment "dates" in question are the dates received in Shell's office, which is affected by variability in the delivery of mail, it seems ill-advised to rely too heavily upon a difference of a few days. By way of example, TCC made a payment that arrived just before Thanksgiving, on November 22, 1988, (a Tuesday), for invoices due about two weeks earlier, on a Monday and Wednesday. In early 1989, a payment was made on January 13 (or 15—the record is unclear), a Friday or Sunday, for an invoice due on Tuesday, nearly two weeks earlier.

The disputed invoices were due on January 21 and 22, 1989, a Saturday and Sunday. The check was mailed on February 3, a Friday less than two weeks later, and received on February 7, a Tuesday, just over two weeks late. Looking at the pattern, it is impossible to say that the payments at issue fell outside the ordinary course of business

based upon a few days deviation from the overall pattern of payment.

Finally, we must consider the equities. Shell was a regular supplier. It was getting paid, though from a slow payer. Under the bankruptcy court and district court rulings, Shell is punished for not terminating its relationship with TCC sooner. Under such an approach, a supplier needs to have rigid bright-line rules to protect itself; otherwise it puts itself at risk. However, the "ordinary course of business" exception is intended to cover precisely the type of situation now before us, allowing suppliers and other furnishers of credit to receive payment within the course that has developed in the commercial relationship between the parties unless substantial deviations from established practices occur.

### 3. Date of Transfer by Check

█ The Bankruptcy Code includes a provision, commonly known as the "new value" exception, which prevents the bankruptcy trustee from avoiding transfers "to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor." 11 U.S.C. § 547(c)(4). The parties stipulated that "Shell advanced $242,263.94 worth of additional new value to Tennessee Chemical Company during the period from February 7, 1989 through February 12, 1989, for which Shell is entitled to credit if the Court uses the date of delivery rule for purposes of 11 U.S.C. § 547(c)(4)." Whether Shell can obtain payment for this new value it provided to TCC hinges upon whether one considers the transfer by check completed on the date that it was delivered to Shell or on the date that the check was honored by the drawee bank.

The bankruptcy court relied in large part upon *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), in concluding that the transfer occurs on the date of honor. 159 B.R. at 514–15. The district court reversed the bankruptcy court on this issue, noting *Barnhill* concerned 11 U.S.C. § 547(b) and that the Court observed in a footnote, "Those Courts of Appeals to have considered the issue are unanimous in concluding that a 'date of delivery' rule should apply to check payments for purposes of § 547(c)." *Barnhill*, 503 U.S. at 402 n. 9, 112 S.Ct. at 1391 n. 9.

The district court advanced the following rationale for its decision:

> Congress identified the primary policy advanced by 11 U.S.C. § 547(b), "[M]ost important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor." H.R.Rep. No. 595, 95th Cong., 1st Sess. 177 (1977). The critical period in furthering this policy of equality of asset distribution occurs when an estate's funds are actually depleted. Since distributive equality for creditors is only endangered when the bank accepts a check and an enforceable interest against funds in the debtor's account is created, the time of honor instead of receipt should determine when a transfer occurs under § 547(b). Section 547(c), however, is generally interpreted to further "the goal of enabling debtors to rehabilitate themselves by insulating normal business transactions from the trustee's avoidance powers." Holding that a transfer occurs at the time of receipt encourages creditors to continue dealing with failing businesses because the transferred funds are protected from avoidance by the trustee. Unlike the date of honor, the date of receipt approach promotes § 547(c)'s primary policy of debtor rehabilitation and will therefore be applied in determining the time of transfer.

Mem. Op. at 11–12 (citations omitted). We believe that this reasoning correctly states the policy considerations that underlie § 547(c) and therefore adopt the date of receipt rule with respect to 11 U.S.C. § 547(c)(4) as the law of this circuit.

### III.

For the foregoing reasons, we **affirm** the Order of the bankruptcy court dated August 4, 1992 regarding the solvency of TCC. We also **affirm** in part and **reverse** in part the bankruptcy court's Order dated October 5, 1993, which reflected the conclusions expressed in that court's memorandum opinion entered on the same date. Accordingly, this

cause is **remanded** for further proceedings consistent with this opinion.