## In re SPECO CORPORATION, Debtor and Debtor in Possession.

### SPECO CORPORATION, Plaintiff,

#### v.

### CANTON DROP FORGE, INC., Defendant.

**Bankruptcy No. 95–34619.
Adversary No. 97-3076.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Feb. 17, 1998.

Christopher J. Freeman, Fred H. Zollinger, Jr. & Co., Canton, OH, for Defendant Canton Drop Forge, Inc.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WILLIAM A. CLARK, Chief Judge.

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the standing order of reference entered in this district. Proceedings to determine, avoid, or recover preferences are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(F). This Decision and Order constitutes the court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052(c).

This matter is before the court on Defendant Canton Drop Forge, Inc.'s Motion for Summary Judgment [Adv. Doc. # 9–1] and Supplement to Motion [Adv. Doc. # 13–1], Plaintiff/Debtor Speco Corporation's Memorandum in Opposition [Adv. Doc. # 19–1], and Defendant's Reply Memorandum [Adv. Doc. # 20–1]. In considering this matter, the court has also reviewed Plaintiff/Debtor's Complaint to Avoid Preference and for Other Relief [Adv. Doc. # 1–1], Defendant's Answer [Adv. Doc. # 3–1], and the Preliminary Pretrial Statements of Plaintiff/Debtor [Adv. Doc. # 6–1] and Defendant [Adv. Doc. # 7–1].

Having considered the evidence and arguments presented by the parties in their pleadings and having conducted an independent examination of the legal issues in question, the court is prepared to render its decision in this matter.

## FINDINGS OF FACT

The question before the court is whether five prepetition transactions between Plaintiff/Debtor and Defendant may be avoided as preferential transfers or whether the transactions were made in "the ordinary course of business." In order to make such a determination, it is necessary to examine both the nature of these transactions and that of the

Robert B. Berner, Arter & Hadden, Dayton, OH, Special Counsel for Plaintiff/Debtor.

parties' previous transactions, as is shown by the evidence before the court.

Speco Corporation, the plaintiff in this adversary proceeding and the debtor in the bankruptcy case at bar ("Plaintiff/Debtor"), is a Delaware corporation with its principal place of business in Springfield, Ohio. On December 22, 1995, Plaintiff/Debtor petitioned for voluntary bankruptcy relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (1994). Canton Drop Forge, Inc., the defendant in this matter ("Defendant"), is an Ohio corporation with its principal place of business in Stark County, Ohio. Defendant produces drop forged material made to customer specifications for customers in various industries.

In late 1991, Plaintiff/Debtor placed its first order with Defendant, and from there on continued to place orders with Defendant on a fairly regular basis. By its customary practice, Defendant would produce and ship each order shortly after the respective order was placed. After shipping each order, Defendant would issue an invoice to Plaintiff/Debtor setting forth the price that was agreed upon by the parties. The terms of the sale were "1/2 % 10, Net 30." This meant that if Plaintiff/Debtor paid for the shipment within 10 days after receiving the invoice, Plaintiff/Debtor would receive a one-half percent discount on the total invoice price. Otherwise, payment in full was due within 30 days after receiving the invoice.

Over the four-year period in which the parties conducted business, Plaintiff/Debtor and Defendant conducted 21 separate transactions in this manner, not including the five transactions at issue here. During this course of dealing, Plaintiff/Debtor never paid for the shipments within the requisite 30 days, instead paying on average 61 days past the invoice date, or an average of 31 days beyond the 30–day net payment requirement. During that time, the latest Plaintiff/Debtor ever made a payment was 79 days after invoice, or 49 days beyond the 30–day net payment requirement, and the earliest Plaintiff/Debtor ever made a payment was one payment made 49 days after invoice, or 19 days beyond the 30–day net payment requirement.

In addition to these 21 prepetition transactions, five additional transactions occurred within the 90–day preference period, as defined in 11 U.S.C. § 547(b)(4)(A). These transactions are summarized as follows:

| Invoice No. | Invoice Date | Invoice Amount | Date Paid | Days Past Invoice | Days Late |
|---|---|---|---|---|---|
| 98551 | 8/17/95 | $ 5,820.00 | 11/8/95 | 83 | 53 |
| 98794 | 9/29/95 | $11,696.00 | 12/14/97 | 81 | 51 |
| 98965 | 10/31/95 | $36,654.00 | 12/19/95 | 49 | 19 |
| 98966 | 10/31/95 | $ 3,920.00 | 12/19/95 | 49 | 19 |
| 98967 | 10/31/95 | $ 4,480.00 | 12/19/95 | 49 | 19 |

*See* Affidavit of William D. Price, at ¶ 11 (attached as Exhibit A to Defendant's Motion for Summary Judgment [Adv. Doc. # 9–1]).

These five transactions were paid an average of 62 days after invoice, or 32 days beyond the 30–day net payment requirement. As Defendant asserts, this is very similar to Plaintiff/Debtor's previous average payment of 61 days after invoice, or 31 days beyond the 30–day net payment requirement. In response, Plaintiff/Debtor alleges that such an averaging is deceptive, as of the five transactions in questions, the first two were made later than Plaintiff/Debtor's previous maximum days late, 79 days after invoice, or 49 days beyond the 30–day net payment requirement, and the remaining three were equal to Plaintiff/Debtor's previous minimum lateness, 49 days after invoice, or 19 days beyond the 30–day net payment requirement, which had occurred previously on only one other occasion.

In addition to the examination of the dates in question, the parties also scrutinize the method in which the payments were made. It was apparently Defendant's normal procedure to accept payments through a lock box at a local bank, not to accept payment direct-

ly from customers. William D. Price, Defendant's Chief Financial Officer, stated in his deposition that hand-delivered checks were not in his definition the ordinary course of business for Defendant. *See* Deposition of William D. Price, Nov. 12, 1997, at pp. 26–27 (attached as Exhibit 6 to Plaintiff/Debtor's Memorandum in Opposition [Adv. Doc. # 19–1]).

Despite this mode of payment history, Plaintiff/Debtor offers evidence that the three payments made on October 31, 1995, just three weeks before Plaintiff/Debtor petitioned for relief in bankruptcy, were hand-delivered by Plaintiff/Defendant. Amongst the evidence presented by Plaintiff/Debtor is the affidavit by its Chief Financial Officer Philip Gassin that Speco had implemented an intentional preference plan prior to the filing of its bankruptcy petition. *See* Affidavit of Philip Gassin, Nov. 24, 1997, at ¶¶ 5–10 (attached as Exhibit 1 to Plaintiff/Debtor's Memorandum in Opposition [Adv. Doc. # 19–1]). Mr. Gassin states that the payments to Defendant were made as part of this plan. Id. at ¶¶ 7–10. Plaintiff/Debtor also submitted the affidavit of its former Purchasing Manager Mike Brugler, who states that in accordance with Plaintiff/Debtor's plan, Mr. Brugler hand delivered three checks to Defendant on December 14, 1995. *See* Affidavit of Mike Brugler, Nov. 24, 1997, at ¶ 8 (attached as Exhibit 2 to Plaintiff/Debtor's Memorandum in Opposition [Adv. Doc. # 19–1]). Mr. Brugler also stated that at the time he hand delivered the checks, he met with Mr. James Culp, an employee of Defendant, and informed him of Plaintiff/Debtor's financial conditions and plans. *Id.* The checks were recorded as received by Defendant on December 19, 1995. A copy of Mr. Brugler's Expense Report Form for the trip in question is also submitted in support of this assertion. *See* Exhibit 4 to Plaintiff/Debtor's Memorandum in Opposition [Adv. Doc. # 19–1].

This evidence is contradicted by the deposition of James Culp, who on the dates in question was a sales engineer for Defendant who dealt with Plaintiff/Debtor. *See* Affidavit of James F. Culp, Nov. 24, 1997, at pp. 4, 10 (attached as Exhibit 7 to Plaintiff/Debtor's Memorandum in Opposition [Adv. Doc. # 19–1]). Mr. Culp testified that Mr. Brugler never visited the Defendant in December of 1995. *Id.* at p. 12. In addition, Mr. Culp testified that he did not receive any hand-delivered checks from Mr. Brugler or any other of Plaintiff/Debtor's employees, and did not inform Mr. Culp of the Plaintiff/Debtor's financial condition or plans. *Id.* at pp. 12–19.

## CONCLUSIONS OF LAW

The Motion before the court is for summary judgment on the issue of voidable preferences and the ordinary course of business exception. The appropriate standard to be used by a trial court when considering a summary judgment motion is contained in Federal Rule of Civil Procedure 56(c), incorporated in bankruptcy by reference in Federal Rule of Bankruptcy Procedure 7056. Rule 56(c) states in part that a court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The initial standard under Rule 56 was addressed by the United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), where the Court stated that:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]he standard [for granting summary judgment] mirrors

the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...."

*Id.* at 322–23, 106 S.Ct. at 2552 (citations omitted).

■ Thus the first question to be answered is whether Plaintiff/Debtor has carried its burden of proof to establish its *prima facie* case that these payments are preferential transfers. 11 U.S.C. § 547(g). This burden never shifts, but the burden to rebut the *prima facie* case may shift. *See, e.g., Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 994–95 (Bankr.S.D.Ohio 1990) (Cole, J.). Even so, the burden is more readily achievable in the context of the nonmoving party facing summary judgment. As the Sixth Circuit has stated, in a summary judgment determination the trial court must "view all facts and inferences in the light most favorable to the non-moving party." *Oakland Gin Co., Inc. v. Marlow (In re Julien Co.)*, 44 F.3d 426, 429 (6th Cir.1995).

Section 547 of the Bankruptcy Code sets forth a five-part test to determine whether a payment is a preference, stating that:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

  (A) on or within 90 days before the date of the filing of the petition; or

  (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

  (A) the case were a case under chapter 7 of this title;

  (B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(1)-(5) (1994).

The undisputed facts demonstrate that the payments were made by Plaintiff/Debtor for the benefit of Defendant on account of an antecedent debt, satisfying § 547(b)(1) and (b)(2). When Plaintiff/Debtor made the payments in the Fall of 1995, they were on behalf of the obligations already incurred by the previous ordering, shipping, and invoicing of the products. These payments were without question beneficial to Defendant. When Plaintiff/Debtor paid the invoices in question within 90 days of the petition date of December 22, 1995, this was sufficient to satisfy § 547(b)(3), as a debtor is presumed insolvent for the period of 90–days prior to the petition date. 11 U.S.C. § 547(f). The Defendant has offered no evidence to rebut this presumption. *See, e.g., Whittaker v. Citra Trading Corp. (In re International Diamond Exch. Jewelers, Inc.)*, 177 B.R. 265, 269 (Bankr.S.D.Ohio 1995) (Waldron, J.), *reh'g denied*, 188 B.R. 386 (Bankr.S.D.Ohio 1995). In addition, making the payment within 90 days prior to the petition was sufficient to satisfy the requirements of § 547(b)(4)(A). Finally, by receiving payment in full on what was essentially an unsecured debt, Defendant was enabled to receive more than it otherwise would have received under a Chapter 7 liquidation, satisfying the requirements of § 547(b)(5).

■ Having determined that Plaintiff/Debtor has, for the purposes of summary judgment only, met the burden of establishing its *prima facie* case, it now becomes important to reexamine the shifting burdens of proof as they relate to summary judgment. While the party seeking summary judgment bears the initial burden of establishing the absence of genuine issues of material fact, the "ultimate burden" of demonstrating the existence of a genuine issue of material fact lies with the nonmoving party. *Suburban Motor Freight*, 124 B.R. at 992.

■ Here Defendant, the moving party, alleges that it is entitled to judgment as a matter of law that the transactions in ques-

tion are entitled to the "ordinary course of business" exception to § 547(b). The Defendant thus bears both the initial burden of fact above, but also the burden of demonstrating by a preponderance of the evidence that the legal theory in question is applicable. 11 U.S.C. § 547(g); *Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.),* 957 F.2d 239, 242–43 (6th Cir.1992).

Section 547(c) provides for eight exceptions where otherwise avoidable transactions may not be undone by a trustee. The "ordinary course of business" exception to § 547(b) is set forth in § 547(c)(2), which states that:

> The trustee may not avoid under this section a transfer ... to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms ....

11 U.S.C. § 547(c)(2) (1994).

According to the Sixth Circuit, § 547(c)(2) is often seen as "a means of encouraging normal credit transactions and the continuation of short-term credit dealings with troubled debtors so as to stall rather than hasten bankruptcy." *In re Fred Hawes,* 957 F.2d at 243. While the transactions in question appear within the scope of the Sixth Circuit's language above, in order for a payment to be considered excepted from the preferential transfer avoidance powers of § 547 Defendant must still establish that each of the transactions fits squarely within the language of the statute. *Id.* at 244 ("[A] creditor attempting to satisfy § 547(c)(2) must prove all three elements of that subsection.").

In order to understand the requirements of each of the subsections of § 547(c)(2), it is necessary to examine what has come to be known as the subjective/objective test. In *Fred Hawes,* the Sixth Circuit addressed a split in the case authority over whether § 547(c)(2)(B) and § 547(c)(2)(C) present different requirements to be satisfied when seeking the ordinary course exception. *Id.* at 243. One line of cases treated these two subsections as requiring proof of essentially the same elements to be satisfied, while another series of cases treated the two sections as independent, requiring proof of different elements for each subsection to be satisfied. *Id.; see also In re Xonics Imaging Inc.,* 837 F.2d 763, 766 (7th Cir.1988) (discussing the split); *Hertzberg v. American Elec. Contractors (In re Steel Improvement Co.),* 79 B.R. 681, 684 (Bankr.E.D.Mich.1987) (same).

In examining this issue, the Sixth Circuit stressed that reading statute subsections as synonymous is tantamount to nullifying Congress's intent behind enacting separate provisions. *In re Fred Hawes,* 957 F.2d at 243. Quoting the bankruptcy court in *Steel Improvement,* the Circuit stated that " '[i]t is a common axiom that a statute should be construed to give meaning to all of its provisions, if possible.' " *Id.* (quoting *In re Steel Improvement Co.,* 79 B.R. at 684).

The net result is that in order for a creditor to satisfy the ordinary course requirements of § 547(c)(2), the creditor must prove that "the debt and its payment are ordinary in relation to other business dealings between that creditor and that debtor," *Id.* at 244 (the "subjective" component), and that "the payment is ordinary in relation to the standards prevailing in the relevant industry." *Id.* (the "objective" component).

With this in mind, the court will examine the transactions in question under each component of § 547(c)(2) and the requirements of the subjective/objective test. *In re Fred Hawes,* 957 F.2d at 242–43; *Youthland, Inc. v. Sunshine Girls of Florida, Inc. (In re Youthland, Inc.),* 160 B.R. 311, 313 (Bankr. S.D.Ohio 1993) (Sellers, J.).

### SECTION 547(c)(2)(A)

Section 547(c)(2)(A) requires that the transfer be "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." While the establishment of a two-part subjective/objective test to determine satisfaction of the three subsections in § 547(c)(2) discussed above has succeeded in attributing independent meaning to

§§ 547(c)(2)(B) and (c)(2)(C), it appears to have had the ironic effect of reading out independent existence to § 547(c)(2)(A). It is clear from the court's formulation of the subjective test that the Sixth Circuit intended for it to incorporate both §§ 547(c)(2)(A) and (c)(2)(B). *In re Fred Hawes,* 957 F.2d at 244 ("the *debt* and its *payment,*" respectively) (emphasis added). Most parties, including those in *Fred Hawes,* presume that the requirement of § 547(c)(2)(A) has been satisfied. *Id.* at 243. Even so, the court will consider the requirements of § 547(c)(2)(A) in light of the existing case law.

In the *Youthland* case, Judge Sellers discussed the application of this first part of the ordinary course test, stating that:

> The first element of § 547(c)(2) requires an examination of the debts incurred for which the transfers were payment for the normality of such incurrences in each party's business operations generally. If the debts were incurred in the routine operations of [the Debtor] and [the Creditor], then they can be said to have been incurred in the ordinary course of each party's business.

*Youthland,* 160 B.R. at 314. These criteria are to be weighed according to previous practices of the parties, the so-called "subjective" test discussed above. *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.),* 872 F.2d 739, 743 (6th Cir.1989).

Provided that these criteria are met, even long-term or first-time debt can be debt incurred in the ordinary course of business. *Union Bank v. Wolas,* 502 U.S. 151, 162, 112 S.Ct. 527, 533–34, 116 L.Ed.2d 514 (1991); *Gosch v. Burns (In re Finn),* 909 F.2d 903, 907 (6th Cir.1990).

In contrast, a debt will be considered not incurred in the ordinary course of business if creation of the debt is atypical, fraudulent, or not consistent with an arms-length commercial transaction. *Pioneer Technology, Inc. v. Eastwood (In re Pioneer Technology, Inc.),* 107 B.R. 698, 702 (9th Cir. BAP 1988); *In re Valley Steel Corp.,* 182 B.R. 728, 735 (Bankr.W.D.Va.1995); *McCullough v. Garland (In re Jackson),* 90 B.R. 793, 794 (Bankr.D.S.C.1988).

In the case at bar, no evidence has been presented that the obligations in question were incurred in anything other than the ordinary course of business. *See* 11 U.S.C. § 547(c)(2)(A). Prior to the transactions in question, Plaintiff/Debtor and Defendant had performed similar transactions on at least 21 separate occasions. Each of the previous transactions and the allegedly preferential transactions were made according to the "1/2 % 10, Net 30" terms described above. The transactions related to the same subject matter, the purchase of custom-made drop forgings to be used in Plaintiff/Debtor's business. The goods ordered were apparently all produced and shipped as per the parties' normal procedures.

It is therefore the conclusion of the court that for the purposes of summary judgment, the five transactions in question were made "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2)(A).

### SECTION 547(c)(2)(B)

In addition to establishing that the *debt* between Plaintiff/Debtor and Defendant was incurred in the ordinary course of business, the requirements of § 547(c)(2)(A), the Sixth Circuit's subjective test also requires the party seeking the protection of § 547(c)(2) to establish that the otherwise preferential *payment* was also made in the ordinary course of business between the parties. 11 U.S.C. § 547(c)(2)(B) (1994).

Among the factors to be considered when determining whether payments fall within the requirements of § 547(c)(2)(B) are timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made. *Yurika Foods Corp. v. United Parcel Service (In re Yurika Foods Corp.),* 888 F.2d 42, 45 (6th Cir.1989).

The Sixth Circuit has addressed the issue of timing on several occasions recently, including several decisions that specifically address the ordinariness of late payments under § 547(c)(2). *See, e.g., Luper v. Columbia Gas of Ohio, Inc. (In re Carled),* 91 F.3d 811, 817–19 (6th Cir.1996) (examining the ordi-

nariness of late payments under § 547(c)(2)(C)); *In re Fred Hawes*, 957 F.2d at 244–45 (holding that late payments must satisfy ordinariness tests under both § 547(c)(2)(B) and § 547(c)(2)(C), separately); *In re Yurika Foods Corp.*, 888 F.2d at 45; *see also In re Fulghum Constr. Corp.*, 872 F.2d at 743 (holding that in examining § 547(c)(2), courts avoid bright-line rules in favor of factual inquiry).

■ In *Fred Hawes*, the Sixth Circuit stated that a "late payment will be considered 'ordinary' only upon a showing that late payments were the normal course of business of the parties." *In re Fred Hawes*, 957 F.2d at 244 (relying in part on *Storey v. Dayton Power & Light Co. (In re Cook United, Inc.)*, 117 B.R. 884, 887–88 (Bankr.N.D.Ohio 1990)). Here, there is no doubt that late payments were within the ordinary course of business between Plaintiff/Debtor and Defendant. As previously discussed, in the 21 prepetition transactions not implicated in these proceedings, Plaintiff/Debtor made its payments on average 31 days past invoice. In fact, in all of the transactions between the two parties, Plaintiff/Debtor never made a payment within the 30–day terms of the parties' agreement. Given these circumstances, the case law is clear that the mere lateness of the payments in question does not cause the payments to be nonordinary.

This is not the end of the inquiry into the lateness of the payments. The Sixth Circuit recently considered the degree of lateness as an indication whether payments were made within the ordinary course of business. *Brown v. Shell Canada Ltd. (In re Tennessee Chemical Co.)*, 112 F.3d 234, 237–38 (6th Cir.1997). In *Tennessee Chemical*, the panel did an extensive analysis of the degree of lateness of each of the allegedly preferential transfers, ultimately concluding that "the 'ordinary course of business' exception is intended to cover precisely the type of situation now before us, allowing suppliers and other furnishers of credit to receive payment within the course that has developed in the commercial relationship between the parties unless substantial deviations from established practices occur." *Id.* at 238.

To this end, Defendant urges the court to consider the average lateness of the payments in question. Indeed, such a surface comparison does imply that the payments in question were ordinary. While the average lateness of the 21 prepetition payments which occurred prior to the 90–day preference period was 31 days past invoice, the five allegedly preferential payments were made on average 32 days past invoice.

■ Such an analysis can be misleading, however. Averages alone fail to take into account extraneous factors such as seasonal influences on performance in certain industries, *see McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*, 185 B.R. 103, 113 (Bankr.E.D.N.Y.1995), or the fact that the unusual weight of individual figures can lead to erroneous averages. *First Software Corp. v. Curtis Mfg. Co., Inc. (In re First Software Corp.)*, 81 B.R. 211, 213–14 (Bankr.D.Mass. 1988). As Judge Sellers indicated, in such instances "a range of payment dates may be more useful … than an average." *Youthland, Inc. v. Sunshine Girls of Florida, Inc. (In re Youthland, Inc.)*, 160 B.R. 311, 315 (Bankr.S.D.Ohio 1993) (Sellers, J.).

Here, the five allegedly preferential transfers occurred at opposite ends of Plaintiff/Debtor's payment spectrum. Chronologically, the first two payments were made 53 and 51 days late respectively, each more than Plaintiff/Debtor's previous maximum lateness of 49 days. The remaining three payments were made only 19 days late, equal to Plaintiff/Debtor's previous minimum lateness. Plaintiff/Debtor had at only one time previously made a payment only 19 days late.

■ The court is in agreement with Plaintiff/Debtor that the statistical analysis alone does little to determine whether the individual payments were made in the ordinary course of business. While the first two payments fell outside the previous range of payments, the Sixth Circuit has concluded that such payments can still be ordinary if they do not substantially deviate from the parties' previous dealings. *In re Tennessee Chemical Co.*, 112 F.3d at 238. Here, the two payments exceeded the previous maximum lateness by only four and two days, respectively. Given that Plaintiff/Debtor

made its payments on average more than four weeks late, such a small deviation beyond the previous range is not substantial. *Id.*

■ Even so, the lateness of the payments is not the only timing inquiry that must be made under § 547(c)(2)(B). The bankruptcy court in *First Software* made it clear that the timing of the payments made in relation to the petition date, beyond the mere fact that the payments were made within the 90–day preference period, is relevant to an inquiry into ordinariness. *First Software Corp. v. Curtis Mfg. Co., Inc. (In re First Software Corp.*), 81 B.R. 211, 213–14 (Bankr.D.Mass.1988).

Here, the first payment of $ 5,820.00 was made on November 8, 1995, more than a month before the filing of the bankruptcy petition. The second, in the amount of $ 11,-696.00, was made on December 14, 1995. These payments were made 53 and 51 days late, respectively. Had Plaintiff/Debtor paid these items 31 days late, its previous average, both payments would have still fallen within the 90–day preference period. Nothing in the timing of these two payments indicates that there was any intent to prefer Defendant over other creditors.

The remaining three payments were made on December 19, 1995, only three days before the filing of the bankruptcy petition. These payments were each made 19 days late, an amount equal to Plaintiff/Debtor's previous minimum lateness. The timing of the payments, within a week of the petition date, combined with the fact that these payments were made almost two weeks earlier than Plaintiff/Debtor's pre-preference average raises the implication that the payments were rushed on the eve of the petition so as to prefer Defendant over other creditors.

These two factors are evidence of a possible "pre-bankruptcy planning" scheme on behalf of Plaintiff/Debtor. Indeed, Plaintiff/Debtor alleges that these payments were made as part of an "Intentional Preference Plan," whereby Plaintiff/Debtor took extraordinary measures to pay important creditors prior to bankruptcy. In support of this allegation, Plaintiff/Debtor submits the affidavits of several key employees. Nothing in these affidavits states, however, exactly when such plan was implemented. In further support of its contention that the remaining payments were made according to a pre-bankruptcy planning scheme, Plaintiff/Debtor points to the method of payment for three payments recorded on December 19, 1995. Plaintiff/Debtor's former Purchasing Manager Mike Brugler states that in accordance with Plaintiff/Debtor's "Intentional Preference Plan," he hand delivered the three checks to Defendant on December 14, 1995. In addition, a copy of Mr. Brugler's Expense Report Form for a trip to the area at the time in question was submitted as evidence that extraordinary measure were taken to deliver the final three payments to Defendant. This evidence is contradicted by the deposition of James Culp, who on the dates in question was a sales engineer for the Defendant. Mr. Culp testified that Mr. Brugler never visited the Defendant in December of 1995, did not hand deliver any check to Mr. Culp, and did not inform Mr. Culp of the Plaintiff/Debtor's financial condition or plans.

Plaintiff/Debtor argues if the payments were made as result of a "pre-bankruptcy planning" scheme the Defendant is prohibited from arguing that the payments were made in the ordinary course of business. In support of this argument, Plaintiff/Debtor cites two Sixth Circuit opinions. *First Fed. of Mich. v. Barrow*, 878 F.2d 912, 918 (6th Cir.1989) (citing *Courtney v. Octopi, Inc. (In re Colonial Discount Corp.*), 807 F.2d 594, 600 (7th Cir.1986), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 526 (1987)); *In re Fulghum Constr. Corp.*, 872 F.2d at 745 (same).

A closer examination of the two opinions, however, reveals that the Sixth Circuit has not determined what effect the state of mind of a debtor should have on an otherwise acceptable payment. In *Barrow*, the debtor was a corporation which acted as a go-between for property owners seeking mortgage loans and lending institutions. *Barrow*, 878 F.2d at 913. Upon making a successful match, the owner would execute a note in favor of the debtor, secured by the property. *Id.* The debtor would then assign the note to the lending institution in return for the bor-

rowed funds, which it then delivered to the owner. *Id.* From that point on, in return for a periodic service charge, the debtor collected the owner's monthly payments, segregated and escrowed the funds, then paid the lender and other appropriate recipients (such as a first lender or taxing authority). *Id.* at 913–14.

During the debtor's bankruptcy proceedings, it was discovered that the debtor had failed to segregate individual payments, instead commingling incoming payments in a incoming depository account and central account. *Id.* During the 90-day preference period, the debtor paid "certain favored creditors ... on behalf of selective investors." *Id.* On appeal from a finding that these payments were preferential transfers, the Sixth Circuit held that "given the totally unorthodox and illegal manner in which debtors conducted their collective business operations during the ninety-day predeclaration period," the panel could not seriously consider the appellant's argument that the payments were made in the ordinary course of business. *Id.* at 918. The panel did not hold that "pre-bankruptcy planning" negated an ordinary course defense, and in fact only mentioned the phrase "pre-bankruptcy planning" in describing the *Colonial Discount Corp.* case. *Id.* (citing *In re Colonial Discount Corp.*, 807 F.2d at 600).

In *Fulghum Constr. Corp.*, after finding that the payments in question were not preferential, the Sixth Circuit simply mentioned in passing that "nothing in the record suggests that [the repayment] was related in any way to prebankruptcy planning." *In re Fulghum Constr. Corp.*, 872 F.2d at 745 (citing *In re Colonial Discount Corp.*, 807 F.2d at 600). Nothing in *Fulghum* states that if the payments were a result of pre-bankruptcy planning the payments would irrebuttably be preferences. In fact, if the Plaintiff/Debtor were to examine the two cases cited to in this discussion in *Fulghum*, it would have found that they do not stand for the proposition that a debtor's subjective intent can negate the ordinary course of business defense. *See, e.g., In re Colonial Discount Corp.*, 807 F.2d at 600; *Marathon Oil Co. v.*

*Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir.1986).

Instead, these cases stand only for the proposition that a debtor's state of mind, when combined with unusual collection practices on behalf a creditor, may combine to provide evidence that payments are not made in the ordinary course of business. *See, e.g., In re Colonial Discount Corp.*, 807 F.2d at 600; *In re Craig Oil Co.*, 785 F.2d at 1566 ("[S]tate of mind alone cannot establish 'unusual' or 'extraordinary' action by the debtor. It merely goes to explain the unusual payment actions by the debtor in this case."); *see also T.B. Westex Foods, Inc. v. FDIC (In re T.B. Westex Foods, Inc.)*, 950 F.2d 1187, 1195 (5th Cir.1992) ("The creditor's or debtor's 'state of mind has nothing whatsoever to do with the policy of equality of distribution.'") (quoting 4 Collier on Bankruptcy ¶ 547.01 n. 12).

Taken as a whole, these cases support the conclusion that when a debtor makes an unusual payment or normal payment in response to unusual collection practices, the debtor's subjective intent is relevant as to the ordinariness of the payment. *In re Craig Oil Co.*, 785 F.2d at 1566. This is consistent with the underlying goal of § 547(b), which is to "'ensure that creditors are treated equitably.'" *Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 243 (6th Cir.1992) (quoting legislative history). When, on the other hand, a debtor makes a payment which otherwise qualifies for the ordinary course of business exception, the debtor's subjective intent will not operate to negate the otherwise appropriate finding of the exception's applicability. *In re T.B. Westex Foods, Inc.*, 950 F.2d at 1195. This is consistent with the purpose of the ordinary course of business exception, which is "formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival." *Luper v. Columbia Gas of Ohio, Inc. (In re Carled)*, 91 F.3d 811, 815 (6th Cir.1996). To hold otherwise would be to encourage an honest creditor to discontinue doing business with a struggling debtor on the off-chance that the debtor's motive in making payments is improper.

Here it is clear that the timing, amount and manner in which the November 8, 1995 and December 14, 1995 payments were made, and the circumstances under which the transfers were made satisfy the requirements of § 547(c)(2)(B) and the relevant case law. *In re Yurika Foods Corp.*, 888 F.2d at 45. These payments do not substantially deviate from the previous range of payments, were not the result of improper actions by the Defendant, and do not otherwise appear to be anything other than the ordinary course of business between the Plaintiff/Debtor and the Defendant. The evidence indicates that these payments would likely have been made regardless of any improper motives by the Plaintiff/Debtor.

As to the December 19, 1995 payments, there exists a genuine issue of material fact in regard to the circumstances under which they were made. Unlike the previous payments, the timing and manner in which the payments were made are not clearly ordinary. In addition, the question as to the manner of delivery appears to be in genuine dispute.

It is therefore the conclusion of the court that for the purposes of summary judgment, Defendant has established that the November 8, 1995 and December 14, 1995 payments were "made in the ordinary course of business or financial affairs of the debtor and the transferee," 11 U.S.C. § 547(c)(2)(B), but that a genuine issue as to a material fact exists as to whether the circumstances surrounding the December 19, 1995 payments satisfy this requirement. As such, the court cannot conclude that summary judgment as to the December 19, 1995 payments is appropriate.

### 547(c)(2)(C)

Having found that circumstances surrounding the payments made on December 19, 1995 are not ripe for summary judgment, the court need only consider whether the November 8, 1995 and December 14, 1995 payments were made in accordance with § 547(c)(2)(C). Section 547(c)(2)(C) requires that in order for the transaction to be entitled to the ordinary course of business exception to § 547(b), the payment must be "made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(C).

As previously discussed, the Sixth Circuit has established what is known as the "objective test" in regard to satisfaction of § 547(c)(2)(C). *Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 244 (6th Cir.1992). "The court here compares and contrasts the particular transaction against the 'practices' or 'standards' of the industry." *Id.* at 245 n. 6. While the *Fred Hawes* panel stated that § 547(c)(2)(C) is satisfied if "the payment is ordinary in relation to the standards prevailing in the relevant industry," *id.* at 244, this does not mean that the transaction must conform with the majority of transactions within the parties' industry, but rather that "the transaction was not so unusual as to render it an aberration in the relevant industry." *Luper v. Columbia Gas of Ohio, Inc. (In re Carled)*, 91 F.3d 811, 818 (6th Cir. 1996).

In *Carled*, the Sixth Circuit made it clear that a creditor need not produce specific information regarding its competitors, but rather need only show that "that a certain percentage of customers pay within a certain number of days after the due date." *Id.* at 819.

Here the evidence offered by Defendant is probative and uncontroverted. Defendant offers by way of affidavit the testimony of William D. Price, Defendant's treasurer and vice president of finance, who states that within the steel forging industry such late payments are not unusual. In support of this, Defendant offers the affidavit of Joseph E. Palmer, a certified public accountant. Mr. Palmer, relying on the Robert Morris Associates Annual Statement Studies for 1996, states that for the iron and steel forgings industry, the standard of late payments varies from an average of 11 days late in the upper quartile of companies to 43 days late in the lower quartile. As with any average, the nature of these figures is that an individual transaction may fall above or below the actual number. As such, Mr. Palmer states that each of the transactions between Plaintiff/Debtor and Defendant made during the preference period, includ-

ing the two transactions still at issue here, are not "unordinary, atypical or aberrational within the industry as a whole."

It is therefore the conclusion of the court that for the purposes of summary judgment, Defendant has established that the November 8, 1995 and December 14, 1995 payments were "made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(C).

CONCLUSION

Having examined each of the elements of § 547(b) and § 547(c)(2) as they relate to the five transactions at issue here, as well as considering the burdens of proof under § 547(g), the court concludes that Defendant is entitled to summary judgment as a matter of law that the November 8, 1995 and December 14, 1995 payments were made in the "ordinary course of business," and thus may not be avoided under § 547 of the Bankruptcy Code.

As to the December 19, 1995 payments, in accordance with Federal Rule of Civil Procedure 56(d), it is the court's determination that the only material issue actually and in good faith controverted is the method of delivery of these payments, and whether the method is "made in the ordinary course of business or financial affairs of the debtor and the transferee" and "made according to ordinary business terms." 11 U.S.C. §§ 547(c)(2)(B) & (c)(2)(C); *see also* Fed. R. Bankr.P. 7056 (incorporating by reference Fed.R.Civ.P. 56).

The Defendant Canton Drop Forge, Inc.'s Motion for Summary Judgment [Adv. Doc. # 9–1] is therefore GRANTED in its entirety as it relates to the November 8, 1995 and December 14, 1995 payments, and GRANTED only as to the satisfaction of 11 U.S.C. § 547(c)(2)(A) as it relates to the December 19, 1995 payments. In all other respects, the Defendant's Motion is DENIED.

The case is set for trial on the remaining issues at 9:30 a.m. on March 10, 1998 in the West Courtroom, 120 West Third Street, Dayton, Ohio.

It is so ORDERED.